**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

GREGORY L. NEACE,                         :

                    Plaintiff,                      Case No. 3:10-cv-444

                                                   District Judge Timothy S. Black
                                                   Magistrate Judge Michael R. Merz

        -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.        :

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence

is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520. First, if the claimant is currently engaged in substantial

gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1. If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSD on January 13, 2006, alleging disability from March 14, 2005, due to a back impairment. (Tr. 68-73; 84). The Commissioner denied Plaintiff's application initially and on reconsideration. (Tr. 41-43; 46-48). Administrative Law Judge Thomas McNichols held a hearing and a supplemental hearing, (Tr 577-614; 615-59), following which he determined that Plaintiff was disabled only for the closed period May 1, 2006, through June 1, 2007. (Tr. 12-31). The Appeals Council denied Plaintiff's request for review, (Tr. 6-10), and Judge McNichols decision became the Commissioner's final decision.

In determining that Plaintiff was disabled only for the closed period, Judge McNichols found that Plaintiff has had severe chronic low back pain attributed to a post-laminectomy syndrome with residuals and depression/anxiety and that from May 1, 2006, until June

1, 2007, Plaintiff's impairments met section 1.04 of the Listings (Tr. 21 ¶ 30) and he was therefore under a disability for that period. *Id.*, ¶ 5. Judge McNichols then determined that medical improvement occurred as of June 1, 2007, the date Plaintiff's disability ended. *Id.*, ¶ 6. Judge McNichols found next that prior to May 1, 2006, and again beginning on June 1, 2007, Plaintiff has not had an impairment or combination of impairments that meets or equals the Listings. ( 25, ¶ 7). Judge McNichols found further that prior to May 1, 2006, and again beginning on June 1, 2007, Plaintiff had the residual functional capacity to perform a limited range of sedentary work. (Tr. 26, ¶ 9). Judge McNichols then used section 201.28 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and concluded that prior to May 1, 2006, and again beginning on June 1, 2007, Plaintiff was able to perform a significant number of jobs in the economy. (Tr. 29, ¶ 14). This led to the conclusion that Plaintiff was under a disability only during a closed period beginning on May 1, 2006, and ending on June 1, 2007. (Tr. 30).

Plaintiff's history of back pain dates to 1996 with subsequent periodic exacerbations. See Tr. 290-300.

The record contains Plaintiff's clinical notes from treating physician Dr. Hofmann dated September 11, 2002, through July 27, 2005. (Tr. 153-64). Those notes reveal that in September, 2002, Dr. Hofmann reported that Plaintiff walked with a slow, stiff gait, had mild tenderness over the mid and lower lumbar spine, a painfully limited range of spinal motion, that his symptoms were most likely due to lumbar degenerative disk disease at L4-5 and L5-S1, and that his recent MRI showed lumbar degenerative disk disease at L4-5 and L5/S1 with moderate foraminal stenosis bilaterally at L5/S1. *Id.* Dr. Hofmann's notes reveal that Dr. Hofmann monitored Plaintiff during the period March- July 27, 2005. *Id.*

4

Treating neurosurgeon Dr. Taha's office notes dated May 16, 2005, to June 25, 2007, are a part of the record.  (Tr. 192-211; 302-12).  Dr. Taha reported on May 15, 2005, that Plaintiff had positive straight leg raising, decreased ranges of motion of his lumbar spine, normal sensation, normal reflexes, and normal muscle strength.  *Id.*  Dr. Taha identified Plaintiff's diagnosis as lumbar disc displacement without myelopathy.  *Id.*  On September 16, 2005, Dr. Taha performed an L5-S1 left discectomy with transforaminal fusion and hardware fixation.  *Id.*  Plaintiff complained of persistent pain postoperatively.  *Id.*  In March, 2006, Dr. Taha reported that x-rays had confirmed that the right rod had slipped superiorly and her recommended a re-application of the right pedicle screw rod and refusion L5-S1 which he performed in May, 2006.  *Id.*  Post-operatively, Plaintiff continued to complain of back and leg pain, Dr. Taha noted there were not any significant findings on Plaintiff's MRI, and he referred Plaintiff to pain management.  *Id.*

The record contains the treatment notes of pain management specialist Dr. Gupta dated January 9 to March 8, 2006.  (Tr. 180-83; 250-59).  Dr. Gupta reported when he first examined Plaintiff, he had a slow gait, positive straight leg raise, and lumbar spine tenderness.  *Id.*  Dr. Gupta identified Plaintiff's diagnoses as failed back syndrome, lumbar facet arthropathy, and right sacroilitis, and he performed bilateral lumbar facet joint injections at L2 through S1 and bilateral sacroiliac injections.  *Id.*  Dr. Gupta subsequently reported that Plaintiff experienced only short-term relief and continued to exhibit tenderness and reduced ranges of motion.  *Id.*

Treating pain specialist Dr. Demirjian's clinical notes dated August to October, 2006, are a part of the record.  (Tr. 276-80).  At the time he first examined Plaintiff, Dr. Demirjian reported that Plaintiff had normal sensory, reflex, and motor examinations, he was able to toe, heel, and tandem walk without difficulty, had difficulty extending and standing upright, and that he had

tenderness over the paralumbar buttocks and the lower thoracic areas.  *Id.*  Dr. Demirjian identified Plaintiff's diagnoses as lumbar diskogenic disease, spondylosis, and possible IS component.  *Id.*  Dr. Demirjian performed a series of epidural injections and lumbar facet blocks, neither of which provided Plaintiff any pain relief.  *Id.*

The record contains the treatment notes from Dr. Scholl dated August 18, 1995, to August 8, 2008. (Tr. 281-300; 477-79).  Those records reveal that Dr. Scholl treated Plaintiff for various medical conditions including back pain, anxiety, lumbar radiculopathy, chest pain, and acute lumbar strain.  *Id.*  During that period of time, Dr. Scholl opined on several occasions that Plaintiff was disabled.  *Id.*  On August 8, 2009, Dr. Scholl reported that he first treated Plaintiff in 1995, he last saw him on June 2, 2008, at which time Plaintiff complained of low back pain with radiation to his left lower extremity.  *Id.*  Dr. Scholl opined that Plaintiff had chronic low back pain, L4-L5, L5-S1 degenerative disc disease and facet arthropathy, and degenerative retrolisthesis with post op screws and bars at L5-S1.  *Id.*  Dr. Scholl also opined Plaintiff was totally and permanently disabled. *Id.*  Dr. Scholl opined further that Plaintiff was able to stand/walk for two and one-half to four hours, sit and alternately sit or stand each for four and one-half to six hours, and occasionally lift up to twenty pounds and that he was not able to perform either sedentary or light work. *Id.*

Plaintiff received treatment from pain management specialist Dr. Watson during the period March 19-August 28, 2007.  (Tr. 313-55).  Dr. Watson reported when he first examined Plaintiff that he had bilateral hip and thigh tenderness, diffuse lumbar spine tenderness, decreased range of motion with pain, and a positive Faber test.  *Id.*  Dr. Watson identified Plaintiff's diagnoses as displaced disc disease, degenerative disc disease, radiculopathy, and sacroiliac dysfunction.  *Id.* On March 22, 2007, Dr. Watson reported that a Lumbar Plexus Study revealed a severely diminished

left L5 peroneal nerve, a moderately diminished right L5 peroneal nerve, and a moderately diminished left S1 sural nerve.  *Id.*  Dr. Watson performed a series of left L5 transforaminal injections which provided Plaintiff with little to no relief.  *Id.*

Plaintiff's treatment records from Advanced Therapeutic Services where Plaintiff received mental health treatment from psychiatrist Dr. Glass which are dated September 14, 2006, to April 28, 2008, are in the record.  (Tr. 403-16).  Those records reveal that when Dr. Glass first evaluated Plaintiff, he essentially noted that Plaintiff displayed normal findings although his mood and affect were dysphoric, and he identified Plaintiff's diagnoses as major depressive disorder and alcohol abuse.  *Id.*  Dr. Glass reported over time that with the exception of his depressed mood, Plaintiff exhibited normal findings.  *Id.*

The record contains treating psychologist Dr. Scott's clinical notes dated August 4, 2006, to May 30, 2008.  (Tr. 417-59).  Those notes reveal that when Dr. Scott evaluated Plaintiff on August 6, 2006, he noted that Plaintiff's mood was constricted and anxious and he identified Plaintiff's diagnoses as major depressive disorder, panic disorder, and alcohol abuse.  *Id.*  Over time, Dr. Scott continued to report that Plaintiff's mood was sad, his affect constricted, and that he exhibited pain behaviors.  *Id.*

Treating physician Dr. Turner's office notes dated August 31, 2007, to January 14, 2008, are a part of the record.  (Tr. 468-76).  Those records indicate that Plaintiff received treatment from Dr. Turner for various medical conditions including otitis media, increased blood pressure, and back pain.  *Id.*

Plaintiff consulted with neurosurgeon Dr. West on January 9, 2008, who reported that Plaintiff had palpable tenderness of the lumber region, decreased ranges of motion of the lumbar

7

spine, was able to stand on his heels and toes, and that his reflexes were 2/4. (Tr. 382-83). Dr. West also reported that Plaintiff had good muscle function, no sensory deficits, and that he had positive straight leg raising at five degrees bilaterally. *Id.* Dr. West identified Plaintiff's diagnosis as post-laminectomy syndrome and he recommended Plaintiff continue with pain management. *Id.*

Plaintiff consulted with pain specialist Dr. Saleh in January, 2008, who reported that Plaintiff expressed pain by verbalizing, splinting, grimacing, and guarding, had an abnormal posture, walked with a limp favoring his left leg, did not require an ambulatory assistive device, and was able to heel and toe walk with severe discomfort. (Tr. 534-42). Dr. Saleh also reported that Plaintiff was able to get on and off the exam table with severe discomfort, he had twelve trigger points, diffuse tenderness/spasm/trigger points, tenderness over the sacroiliac and facet joints on the right and left, decreased ranges of lumbar motion, and that he had positive straight leg raising at forty degrees. *Id.* Dr. Saleh identified Plaintiff's diagnoses as post lumbar laminectomy syndrome, spondylosis of the lumbar spine, lumbar degenerative disc disease, lumbar radiculopathy, and lumber intervertebral disc displacement. *Id.* Subsequently, Plaintiff declined to return to Dr. Saleh's office for further treatment because "it was too far to drive, too long of a wait, [and] too crowded in the waiting room." *Id.*

The record contains the clinical records from treating pain specialist Dr. Soin dated March 4-July 30, 2008. (Tr. 492-533). When Dr. Soin initially examined Plaintiff, he reported that Plaintiff's spine was tender, he had positive straight left raising, bilateral facet loading, and decreased ranges of motion. *Id.* Dr. Soin identified Plaintiff's diagnoses as lumbar radiculopathy, post-laminectomy syndrome, and neuritis radiculitis; he recommended a series of epidural injections. *Id.* Subsequently, Dr. Soin reported that Plaintiff had not experienced any relief from the first

8

injection and he (Dr. Soin) cancelled the remaining injections and recommended a spinal cord stimulator. *Id.*

Psychologist Dr. Flexman examined Plaintiff on June 13, 2008, for purposes of clearing him psychologically before Dr. Soin performed the spinal stimulator procedure. (Tr. 464-67). Dr. Flexman reported that Plaintiff had a high school education, walked with a gait disturbance, bent over and with a moderate limp, his facial expressions revealed some apprehension, he was generally fidgety, that his speech was normal, and that his affect was generally appropriate. *Id.* Dr. Flexman also reported that Plaintiff exhibited overt pain behavior, his scores on the Beck Anxiety and Depressions Scales were both within the moderate to severe range, and that he was experiencing rather marked anxiety and depression. *Id.* Dr. Flexman opined that with the support system that Plaintiff had in spite of his psychiatric problems, he would be a good candidate for the spinal stimulator. *Id.*

Dr. Glass reported on August 8, 2008, that Plaintiff had been incapable of working since his first visit to Dr. Glass in September, 2006, that he was moderately to moderately severely limited in his abilities to perform work-related mental activities, and that his prognosis was guarded. (Tr. 480-84).

Dr. Turner reported on August 12, 2008, that Plaintiff had been his patient since August 21, 2007, his diagnoses were chronic severe lumbar pain which radiated down his left leg related to lumber intervertebral displacement, post laminectomy syndrome, lumbar degenerative disc disease, hypertension, depression, anxiety, insomnia, vertigo, and gastroesophageal reflux disease. (Tr. 485). Dr. Turner also reported that the severity of Plaintiff's pain made it difficult for him to stand, sit, or walk for more than thirty minutes at a time without a break which impaired his ability

to attain and maintain gainful employment, that the combination of his multiple conditions has caused him to experience insomnia, depression, and anxiety, that he continued to experience pain at the level of nine on a scale of one to ten, and that he was a candidate for disability as maintaining full-time employment would be extremely difficult. *Id.*

On August 15, 2008, Dr. Scott reported that Plaintiff had been his patient since August, 2006, that his diagnoses were major depressive disorder and panic disorder, and that he was not able to work in substantial gainful activity in a competitive work environment on a sustained basis. (Tr. 486). Dr. Scott also reported that Plaintiff was not able to handle the stresses associated with work such as interacting with others and meeting deadlines and that he had not been able to work since at least August 7, 2006. *Id.* Dr. Scott opined that Plaintiff was moderately to moderately-severely impaired in his abilities to perform work-related mental activities, his prognosis was poor, and that Plaintiff had depression and panic secondary to chronic pain. *Id.*

Examining physician Dr. Vitols reported on October 20, 2008, that Plaintiff presented with a slow and stiff gait, was observed changing positions with minimal effort, had severe myospams to palpation of the dorsolumbar spine, tenderness to the lumbar spine, and that he had actively restricted painful ranges of motion. (Tr. 543-48). Dr. Vitols also reported that Plaintiff's straight leg raising was painful at forty-five degrees bilaterally, he was able to perform heel toe walk satisfactorily, and that his sciatic notches were nontender to palpation. *Id.* Dr. Vitols identified Plaintiff's diagnoses as post-laminectomy syndrome and hypertension probably uncontrolled. *Id.* Dr. Vitols opined that Plaintiff had no impaired ability to use his arms on a regular daily basis and that he did not have the capacity to stand, walk, bend, or carry materials on a regular basis. *Id.*

Plaintiff received treatment from interventional radiologist Dr. Syed during the period

November 25-December 26, 2008.  (Tr. 569-76).  Dr. Syed reported the first time he examined Plaintiff, he reported that Plaintiff had decreased sensation to vibration within the bilateral posterior thighs and within his posterior calves, 5/5 motor strength, was unable to walk on his heels and walk only slightly on his toes, could not perform single leg raises, positive straight leg raises at 5 degrees bilaterally, and that his reflexes were brisk and symmetrical.  *Id.*  Dr. Syed also reported that Plaintiff had moderate lifestyle limiting back pain which was attributable to lumbar facet joint syndrome especially at the bilateral L1-L2 facet joints and to a slightly lesser degree at the bilateral L3-L4 facet joints as well as left L2-L3 facet joint.  *Id.*  Dr. Syed performed on Plaintiff a left medial branch blocks with fluoroscopic guidance on December 9, 2008, and after positive results, on December 26, 2008, he performed multi-level left medial branch denervation with fluoroscopic guidance.  *Id.*

A medical advisor (MA) testified at the hearing that Plaintiff met Listing 1.04 from the date of his second surgery until one year later.  (Tr. 638-44).  Tha MA also testified that after that one year period, Plaintiff was able to perform sedentary work which did not involve repetitive lifting below the waist or require stooping, kneeling, crawling, or climbing ropes and ladders.  *Id.*

Plaintiff alleges in his Statement of Errors that the Commissioner erred by failing to give the proper weight to his treating physician's opinion and by failing to give the proper weight to his treating psychiatrist's and psychologist's opinions.  (Doc. 6).

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards."  *Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009).  "One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-

treating physicians because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."

*Id.*, *quoting*, *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544, (6th Cir. 2004), *quoting*, 20 C.F.R. § 404.1527(d)(2).

"The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley,* 581 F.3d at 406, *quoting, Wilson,* 378 F.3d at 544.  "On the other hand, a Social Security Ruling[1] explains that '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996).  "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Blakley,* 582 F.3d at 406, *citing, Wilson,* 378 F.3d at 544, *citing* 20 C.F.R. § 404.1527(d)(2).

---

FN 1.  Although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

"Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Blakley,* 581 F.3d at 406, *citing,* 20 C.F.R. §404.1527(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley,* 581 F.3d at 406-07,*citing,* Soc.Sec.Rule 96-2p, 1996 WL 374188 at *5. "The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."

*Blakley,* 581 F.3d at 407*, citing, Wilson,* 378 F.3d at 544. "Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley, supra, quoting, Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6th Cir. 2007)(emphasis in original).

In support of his first Error, Plaintiff argues that the Commissioner erred by rejecting Dr. Scholl's opinion that he (Plaintiff) is disabled.

13

In rejecting Dr. Scholl's opinion, Judge McNichols determined that it is not supported by the clinical evidence and is inconsistent with other evidence.  (Tr. 28).  Judge McNichols specifically noted that Dr. Scholl's opinion is based primarily on Plaintiff's subjective complaints of pain.  *Id.*

The Court notes that this case is, in fact, a kind of "pain case".  The record makes it clear that Plaintiff has consistently complained of pain since at least his alleged onset date of March, 2005.  Indeed, Dr. Hofmann noted in 2002, three years before Plaintiff's onset date, that Plaintiff had objective clinical findings including a slow, stiff gait, and tenderness over his lumbar spine, painfully limited ranges of spinal motion.  In addition, Plaintiff's 2002, MRI revealed lumbar spine disease with moderate stenosis bilaterally at L5/S1.  Treating pain management physician Dr. Gupta noted in January, 2006, that Plaintiff had a slow gait, positive straight leg raise, lumbar spine tenderness and subsequently noted that although Plaintiff had undergone bilateral facet joint injections, Plaintiff experienced only short-term relief from his pain.  Treating neurosurgeon Dr. Taha documented objective clinical findings before he performed Plaintiff's first surgery in September, 2005.  Dr. Taha reported Plaintiff's consistent complaints of pain after he performed Plaintiff's first surgery as well as after he performed Plaintiff's second surgery in May, 2006.  Similarly, treating pain specialist Dr. Watson, consulting pain physician Dr. Saleh, and treating pain specialist Dr. Soin all reported Plaintiff's consistent complaints of pain as well as objective clinical findings including tenderness, decreased ranges of motion, abnormal posture and gait, inability to heel and/or toe walk, the presence of trigger points, spasm, and positive straight leg raising.  In other words, Plaintiff has consistently complained of pain and numerous treating physicians of record have consistently reported positive objective findings.

Dr. Scholl has been Plaintiff's long-term treating physician.  Over time, as did the physicians cited above, Dr. Scholl reported Plaintiff's consistent complaints of pain.  In addition to Dr. Scholl's opinion that Plaintiff is disabled being supported by the findings of the above-cited physicians, Dr. Scholl's opinion is supported by examining physician Dr. Vitols' opinion.  As noted above, Dr. Vitols noted that Plaintiff exhibited positive straight leg raising, severe myospasms, tenderness, and restricted ranges of motion and opined that Plaintiff did not have the capacity to stand, walk, bend, or carry materials on a regular basis.

This Court concludes that the Commissioner erred by rejecting long-term treating physician Dr. Scholl's opinion that Plaintiff is disabled.  This is particularly true since this case is essentially a "pain case" and the objective clinical findings support Plaintiff's allegations of disabling pain.  *See, Jones v. Secretary of Health and Human Services,* 945 F.2d 1365 (6th Cir. 1991); see also, *Duncan v. Secretary of Health and Human Services,* 801 F.2d 847 (6th Cir. 1986).  Accordingly, the Commissioner's decision that Plaintiff was not disabled prior to May 1, 2006, or after June 1, 2007, is not supported by substantial evidence on the record as a whole.

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to remand the matter for rehearing or to reverse and order benefits granted.  The Court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  42 U.S.C. §405(g).  If a court determines that substantial evidence does not support the Commissioner's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 176 (6th Cir. 1994) (citations omitted);  *see also, Newkirk v.*

15

*Shalala,* 25 F.3d 316 (6th Cir. 1994).

This Court concludes that all of the factual issues have been resolved and that the record adequately establishes Plaintiff's entitlement to benefits.  Specifically, as determined above, Dr. Scholl has been Plaintiff's long-term physician and has opined that Plaintiff is disabled and the record reveals numerous long-term, consistent, objective clinical findings that support Plaintiff's complaints of disabling pain.  See *Jones, supra*; see also *Duncan, supra.*

It is therefore recommended that the Commissioner's decision that Plaintiff is not disabled be reversed.  It is also recommended that this matter be remanded to the Commissioner for the payment of benefits consistent with the Act.

August 26, 2011                                                             s/ **Michael R. Merz**
                                                                                    United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).